Good morning, your honors. My name is Jack Morris. I'm an attorney from Helena, Montana, and I represent the defendant appellant in this matter, John Edward Lewton. The case has been thoroughly briefed. I'm not going to read my brief or go back through that for the court. But I think what this case, what Judge Sam had and was the district court judge who reviewed the magistrate judge Keith Strong's findings, we had a bench trial in this matter. But initially this case was charged, it was a two-count information. Count one was a violation of 36 CFR 261.1, occupancy and use. That was on BLM property in eastern central Montana, the Missouri River Breaks National Monument. And count two of the indictment was in an area called Lower Rock Creek, which is in western Montana. At the pretrial conference, and that occurred on Forest Service property, and that was a count, that was a class B misdemeanor. The Bureau of Land Management count one case was a class A misdemeanor. At the pretrial conference, or prior to the pretrial conference, Mr. Lewton demanded a jury trial in this matter. At the pretrial conference, the United States dismissed the count, or the class A misdemeanor, which deprived Mr. Lewton of a jury trial. And he went to trial with a bench trial with Judge Keith Strong sitting as the magistrate judge. Isn't the issue in front of us sufficiency of the evidence? Yes, it is. And I'm just kind of giving a little background of how this got to be where it is. Your Honor, I think the sufficiency of the evidence argument, and that is what we are appealing, I would submit to the court that under public law 106.26, which is attached to my excerpts of the record, this law was passed by Congress on May 26, 2000. And the pertinent part would be subsection C, the definition of still photography. And it goes on as accepted in paragraph 2 of the secretary, and this is the secretary of the agriculture or the secretary of the interior for the BLM property. The secretary shall not require a permit nor assess a fee for still photography on lands administered by the secretary if such photography takes place where members of the public are generally allowed. Well, the only issue here is that they didn't actually have, they didn't find any video. Exactly. And so, but the statute, as I understand it, makes it that the, what is prescribed is taking the films, not having the films or using the films or selling the film, but taking the film. Work activity, yes, the government has argued that Mr. Luton videographed this hunt. Right. However, the record. If he took it and took videos, went back to his truck and deleted them all, he would have violated the ordinance. Theoretically, yes. Okay. So why isn't the crime complete when he signs the videography agreement and carries onto the land photography equipment that is capable of taking video digital recordings and is seen shouldering the camera by the hunter who testifies that he watched him do that? Does it really matter whether or not they recovered any digital video? I would argue, yes, it does matter, Your Honor. They did recover video and they did recover a video card. They were examined by the. But why isn't the crime complete when he enters onto federal land without the permit with the intent to engage in commercial videography? Because, Your Honor, he only engaged in still photography. The equipment that he had. The issue is whether or not there's sufficient circumstantial evidence to permit Judge Strong as the trier of fact to conclude that he did actually take video recordings, but for some reason it disappeared or maybe he deleted it. I mean, we just don't know. But isn't that enough to permit a reasonable trier of fact? I would say no, Your Honor, because the government wants you to draw an inference that there was some nefarious activity. Let me ask a question. The literal question that Judge Taubman asked you is, is it enough to go onto the property with the intent to take the video? And is the answer to that yes or no? No. I think it's no, right? It's no. Because he actually took it. I would submit that there actually. At least run the camera. Run the camera according to the. If it were to work, that wouldn't matter, I suppose. Well, I would. That's the question. I would think the camera would have to work. There would have to be still or moving images. That's how it's defined. But if the evidence were. I mean, the peculiar thing here is that the person who said he believed he was taking the video also said later that he didn't know that this camera could take still photography. Exactly. So therefore, his impression was apparently based just on the fact that he was using the camera. And that is not really. Again, he was the State's witness who had the only personal knowledge. But suppose if the witness had said I saw him running the video part of the camera. And then it turned out that there was no video, maybe because it didn't work. That would be a different situation. That would be a different situation. Mr. Rapepi testified he didn't know whether he was videographing or taking still digital photographs. He didn't say that. He just said he. I didn't read it that way. I just read him just saying I thought he was videographing. But later he says across I didn't know that this camera could take still. But he didn't say I didn't know. He said I thought, I believed. I believed. But he also believed that this camera was only a videographer. He was not aware that it was capable of taking both video and shooting digital still. Speaking of awareness, is there anything in the record to suggest that Mr. Luton was unaware of the requirement that he had to have a work permit? No. My understanding was when, and that's why I was talking about the Class A misdemeanor in the BLM ground, Mr. Luton did have a work permit for videography in that case, but that was dismissed. Didn't they also find a copy of the regulations? They did find a copy of regulations that he had downloaded from his computer, and he was well aware of what the regulations were, and he didn't violate them. But the problem is that in order to think that he didn't take the videos, you have to think he was scamming the guy he was working for, right? Your Honor, the production of outdoor videos, sometimes they use videos. Sometimes they use still photography in the video, and I'm not an expert on how to make one of these. But it also, this is a hunt of a wild animal. You have to get close enough, okay, to make it worth videotaping. That's not the question Judge Berzon is asking. I mean, he paid, Rapeppe paid Mr. Luton $7,000 for the video of the hunt of a lifetime. Video and photography. To answer Judge Berzon's question, if Luton was actually ripping off Mr. Rapeppe because he had no intention of video recording the hunt, then this whole thing was a scam. Why would Judge Strong have to believe that in the face of this evidence? Well, again, Hunting District 210 is comprised of thousands of acres of federal, state, and private land. This was a wild animal that does not respect boundaries. It depends upon where they found the animal and where Mr. Luton was. So you think he may have been filming on the land on which he did have a permit. State land does not require a permit. And then photographing on this. And he photographed 222 still digital photographs. On September 23rd, I think there were 23 taken. Rapeppe identified for the court during his testimony the areas on the map where he hunted and testified that Luton was using the camera throughout the hunt. Yes, he was. So why isn't that sufficient evidence to permit Judge Strong to determine that the hunt occurred on federal land? The hunt, we are not contesting it didn't occur on federal land. We're contesting that, and the state will argue, we don't have to produce a video to prove a crime was committed. They did produce a video, but there was nothing on it. Their own expert looked at it. It wasn't corrupted. It wasn't destroyed. It wasn't erased. But the fact that they didn't recover anything a day after the hunt, it's possible that he downloaded the video to a computer at home. They only searched his taxidermy shop, correct? They were waiting for him. He came back from Missoula, the Missoula area. His shop was surrounded. Was there or was there not a 24-hour lapse of time between the end of the hunt and the execution of the hunt? The dates of the still photography were October 6th. The hunt occurred. I think the animal was trophied on October 6th with the Fish, Wildlife, and Parks of Montana. But, again, Mr. Luton showed up at his shop. The video camera was still plugged into the power unit of his pickup truck. The videotape and the video card were recovered. They were analyzed by Mr. Wegg. But there was time for him to go home and download it to his computer. Was there not? There was. Yes or no? It's a very simple question. There was. Okay. There could have been. But none of that was brought out. There was no inferences of alteration or being erased. There was none of that. Can I ask a question, Nate? You said that there was an expert who looked at it and said it wasn't erased? Yes. Is that the record? Mr. Wegg was unavailable to testify, but Mr. Murphy and Mr. Oudman, who was the investigator for the force surface, testified to that, and they had, in conjunction with Mr. Wegg. That's in the record? Yes. What did they testify? Where is that in the record? It's in the record that there was nothing found on the video. I know that, but you said that there was evidence that it wasn't erased. If it was on the disc on the camera, and, but it wasn't. It wasn't there. But you just said that it wasn't, that there was evidence that it hadn't been erased from there. I believe both Mr. Murphy and Mr. Oudman testified that the video card and the on either one of those parts of it, and there was no evidence submitted that either one of those were tampered with or erased. All right. Thank you very much, counsel. Your time has expired. We'll hear from the governor. Good morning, Your Honors. My name is Leif Johnson for the United States. You know, one of the reasons I don't think we need to actually get into whether or not there was the destruction of this film or not is because the 36 CFR provision here prohibits conducting any kind of work activity, and that is further defined in the Forest Service handbook as, and I'm quoting here, a special use permit is required for all, quote, commercial filming activities. All right. And our position would be that if a person goes out under a contract to produce and provide a videograph of a hunting scene and they're out in the forest for four days, those are commercial filming activities. But if he never films anything? There was evidence from which the court No, I want to ask you that question. Even if he never films anything? If the purpose of the trip is to take still photographs, that's true, Your Honor. But if the purpose of the contract is to provide a videograph and he goes out with the intent to complete those activities? Never does anything. Never films anything. Yes or no? No. No. So that isn't enough. It is enough. Your answer is yes. Yes, it's enough. Yes, it is enough. If he just goes out there under a contract to film, but he never films. Right, because the whole intent is using the forest for a commercial activity. So a film isn't produced. We don't know. Well, a film isn't produced is different from not filming. Right. My hypothetical is he never films anything. Okay. So if he goes out on the forest for the It's a scam. All right? He goes out there, he makes believe he's filming, but he's not filming. And that's a scam. Right. But is it a violation of the ordinance? Only if it could be considered a commercial filming activity. That's what I'm asking you. Can it or not? Yes or no? Yes. I think it can if he used commercial filming material to go out and use the forest. And doesn't film anything. And there's no evidence of film. I'm not saying no evidence of film. I'm saying he filmed nothing. He did not run the film. That's obviously a close case, Your Honor. And that's not this case, but that is a close case. But what's your argument then? I thought you walked in here and said that this would be the case because all he had to do was be there under a contract to film, even if he didn't film. Now you're saying that's not true. Our argument here is that we don't need to go into what exactly happened to the final product because the evidence showed that there was commercial filming activity. What's the evidence that it was a commercial filming activity other than that there was a contract to do it? But what's the evidence that he did it? That he carried around a commercial filming apparatus. Which also takes photographs. Of course, they all do, which was part of the record there. So what? And that the client here expected to receive a videograph of his hunt. Right. And that he paid $7,000 for it. But he didn't. And that the evidence was that he was being followed around on public land without a permit, specifically under circumstances that would indicate he was producing this videograph. And, in fact, that was his business. What are the circumstances other than that he had a camera that was capable of it? And he was under a contract to do it. But what's the evidence that he did it? The evidence that he did it is that he had done it many, many times before. That was his business. With or without permits in the past? Yes. I don't know what the record was with regard to those other films, Your Honor. What is the policy? Is it a request like this routinely granted? Or is it subject to some sort of restriction? Or is it very expensive for the permit? What do we know about that? Well, Mr. Ubin testified in the trial about the permitting process. And that's a good question, Your Honor. It's a fairly nominal fee of $150 is what he testified. But the point is and the reason is. But is it routinely granted? Or is there some limit, restrictions? I think the Forest Service handbook basically directs that a permit be issued under conditions that can protect the forest. What's the but? You said but. The but is that there's a gross fee on further sales. And that's what this Mr. Luton was doing. He was selling these videos. Is it true that he did have a permit for some of the land? That may have been for the other land. I'm not certain here. I'm looking only at what the record is. So it's perfectly possible that he was taking the films in one place and stills in the other place. Sure. You know, you would. Well, how could I say beyond a reasonable doubt with no evidence of an actual film that that isn't what happened? Because. You have the photographs. You don't have the film. And so where and we have a beyond a reasonable doubt standard, right? Yes, we do. And we have strong inferences in this case that filming activity occurred. And let me just run through why we think that the judges, the inferences the judges make were correct. He's in the business of filming. He sells these films. That's part of what he does. He is aware of the permitting requirements. Obviously, it's expensive for him to comply. But the record shows that there was an e-mail from the client. They're friends. This isn't somebody he would go out and try to defraud. They're longtime friends. That's why they set up this deal. It now turns out, which is interesting to me, that he wouldn't even have to be defrauding him because he could have been taking a video of a good chunk of the hunt and photographing the rest of it. He could have been. He could have taken a video. So, therefore, the fact that the customer said, you know, I can't wait to see the film doesn't mean that there wasn't one. Of course, the customer isn't running the video camera. So he can never say for certain that that thing was running. And, of course, you know, a video couldn't be taken of part of the film and then dropped in the river and lost forever. That doesn't mean that a commercial videographing activity wasn't taking place. But what about what at the end of your opponent's argument, he said that there was that the evidence was that not only wasn't there anything on the disc, but that there was evidence that it wasn't erased. Is that correct?  Counsel, let me ask you a different question. I noticed that, first of all, this is a criminal case, right, not a civil fine or anything like that. And the crime, I guess, is defined in a CFR. It's not a statute. It is defined in 36 CFR, yes. 26110? Yes. And what's the authority for an agency to promulgate a crime as opposed to the Congress defining what a crime is? Congress has delegated to the various agencies numerous misdemeanor offenses within the federal land. So, for instance, if you go to a national park, you can be ticketed for having a dog off a leash or drinking or even, you know. And misdemeanor at the fine level is what? Up to how many thousand dollars? I think it's $5,000 in this case, Your Honor. And I think that the federal. But the fine here was $7,000, was it not, and with a remission? I think it was limited to the statutory amount. Wasn't it $5,000 with $2,000 suspended? Yes. So in a net of three. So what you're saying is this was within the misdemeanor limit. Yes. Isn't there an enabling statute? In other words, Congress passes a statute that authorizes, in this case the Forest Service, to promulgate regulations to establish what constitutes a misdemeanor. And there are hundreds of them, right? I mean, there are literally hundreds of misdemeanors. That's what bothers me. I just have a visceral resistance to the idea that bureaucrats can define crimes, which can actually put people in jail and charge them as much as $5,000 in fines. Yes. And I understand your frustration. You know, coming from Montana, which is huge chunks of federal land, obviously the land management agencies have to have some authority to protect what goes on within the boundaries of their authority. And in this particular case, commercial filming activities potentially has an effect on other uses. Would a permit also be required for, let's say, the filming of a wedding that's inside federal land? No, Your Honor. It has to be commercial filming. And that's what the statute says. Well, talk about that. A commercial, in other words, you hire a videographer to video your wedding. The statute and the regulations define a commercial film as something that is a moving picture of, it has to be of natural events. And let me make sure I have that correct. So a wedding, if the same person were to take, be hired to do a wedding, no permit is required? No. I understand this is for not where we are, but what is the point of this? What difference could it possibly make to the world or to the animals, whether you're taking a photograph or a film? I think the point is that there are a lot of competing uses for federal land. Right. And that the various competing uses need to be somehow, you know, sort of under one aegis of control, and some parties go out and use the federal land for profit. I understand that. But apparently in this case, if there were definitive proofs that he only took photographs, it would be fine. If with exactly the same camera in exactly the same places, standing in exactly the same way, that's fine. But using the same camera and running a different button on it becomes a misdemeanor. That's right. And Congress, you know, deferred to the agency to define out still photography. And, of course, there's reasons for that because there's a greater market for films of hunting, you know, expeditions. I mean, these things are on sale. You can go on the Internet and find them and buy them. You can go on the Internet and get Mr. Lewton's, I have no doubt. There's not a big market for people to take pictures of elk in Yellowstone? It's not the same as the kill shot on a big ram. I'm sorry, but that's what it is. All right. Thank you very much, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Berzon, Tallman